**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **DYLAN BANGERT,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) No. 3:24 C 50272 |
| | ) |
| **U.S. EMBASSY IN ETHIOPIA, CONSULAR SECTION, NATIONAL VISA CENTER, UNITED STATES CITIZEN AND IMMIGRATION SERVICES,** | ) Judge Rebecca R. Pallmeyer |
| | ) |
| **Defendants.** | |

**MEMORANDUM OPINION AND ORDER**

Dylan Bangert's wife, Afomiya Animaw, is a citizen and resident of Ethiopia. Bangert has filed this pro se complaint seeking an order that would direct Defendants—the United States Citizen and Immigration Services ("USCIS"), the United States Embassy in Addis Ababa, Ethiopia ("the Embassy"), and the National Visa Center ("NVC")—to schedule a visa interview for Animaw, and then to approve her immediate-relative visa application. The visa would enable Animaw to apply for a Green Card in the United States and escape the grave risk of violence, abduction, and sex trafficking that Bangert alleges she faces in Ethiopia.

As the court understands Bangert's pleadings, he asserts that Defendants owe him and/or his wife Animaw a duty to schedule Animaw's visa interview and to approve her visa application. Bangert suggests that the source of this duty is an unenumerated right under the Fifth or Ninth Amendments of the Constitution, or the Immigration and Nationality Act ("INA"). Bangert seeks a writ of mandamus, or other injunctive relief, pursuant to 42 U.S.C. §§ 1983, 1985, or 1986, the Administrative Procedure Act ("APA"), or a common law negligence theory. In response to Defendants' motion to dismiss [16], Bangert confirms that he does not seek an award of damages.

Bangert's complaint suggests that he believes the NVC is a rogue organization within the government that has been lawlessly interfering with Animaw's visa case. As the court explains

below, that is not true: the United States Department of State ("State Department") is tasked by statute with adjudicating Animaw's immediate-relative visa application, and the NVC is the entity within the State Department that handles these applications. Although Bangert urges that USCIS, which is part of the Department of Homeland Security, should process Animaw's application, USCIS's only role in the immediate-relative visa application process is to verify that the noncitizen applicant is, in fact, the spouse, child, or parent of the citizen. USCIS then forwards that information to the NVC and becomes involved again in processing the noncitizen's Green Card application only if the visa is approved.

Bangert's contention that USCIS is responsible to act now is a non-starter, and all claims against USCIS are dismissed with prejudice. Similarly, because the court has no authority to order either the NVC or the Embassy to approve Animaw's visa application regardless of what facts Bangert might allege, his claims are dismissed with prejudice to the extent they seek such an order. Finally, while Bangert may have a basis to bring a claim against the NVC and the Embassy for unreasonable delay in adjudicating Animaw's visa application, the allegations of Bangert's initial complaint do not sustain that claim, and it is dismissed without prejudice. As explained below, any unreasonable delay claim would have to be asserted pursuant to the APA: Bangert has no constitutionally protected interest in Animaw's visa application and the court lacks jurisdiction to consider claims for injunctive relief against the federal government based on a negligence theory.

Should Bangert choose to pursue the APA claim in an amended complaint, he is warned that the new complaint should consist of a list of numbered paragraphs containing a short and plain statement of his allegations and his claims for relief. The initial complaint Bangert submitted is insufficient, as it presents little more than emails attached to a form complaint. Further, to state a claim for unreasonable delay, Bangert must allege, at a minimum, the date by which Animaw's visa application with the NVC became "documentarily complete"—that is, the date by which

2

Animaw and Bangert had submitted all the necessary forms and fees associated with the application.[1]

## **BACKGROUND**

This dispute concerns the application of Bangert's wife, Afomiya Animaw, for an immediate-relative immigrant visa. The court reviews the process by which these visas are issued before describing the allegations in Bangert's complaint.

I.  **Statutory and Regulatory Background**

Under the INA, noncitizens who are the "immediate relatives" of a United States citizen—the citizen's spouse, children, and, if the citizen is at least 21 years old, parents—may apply for lawful permanent resident status, also known as a "Green Card." *See* 8 U.S.C. §§ 1186a(a)(1), h(1); § 1151(b)(2)(A)(i); *Green Card for Immediate Relatives of U.S. Citizen*, USCIS, https://www.uscis.gov/green-card/green-card-eligibility/green-card-for-immediate-relatives-of-us-citizen (last visited July 3, 2025). Noncitizens may not apply for a Green Card, however, until an immigrant visa is available for them. *See I-485, Application to Register Permanent Residence or Adjust Status*, USCIS, https://www.uscis.gov/i-485 (last visited July 3, 2025). The number of visas available each year for some categories of immigrants are capped by the INA, but for other categories—including immediate relatives of citizens—there is no numerical limit. *Compare* 8 U.S.C. §§ 1151(a), 1152(a) *with* § 1151(b). But there are also no guarantees, and noncitizen spouses are not always granted this visa.

The process of obtaining an immediate-relative visa consists of two steps. First, the U.S. citizen who seeks to claim an applicant as an immediate relative must petition the United States Attorney General to have their relative classified as such. 8 U.S.C. §§ 1154(a)(1)(A)(i), (b); 8

---

[1] If he chooses to submit a proposed amended complaint, Bangert is encouraged to contact the court's Pro Se Help Desk. *See* U.S. DIST. CT. N.D. ILL., *Pro Se / Representing Yourself*, https://www.coop.ilnd.uscourts.gov/LandingPage.php?page=pro_se; U.S. DIST. CT. N.D. ILL.*, Hibbler Federal Court Help Desk*, https://hibbler-memorial-pro-se-assistance-program.appointlet.com.

C.F.R. § 204.1(a)(1). This petition is submitted to USCIS via Form I-130. *Form I-130: Petition for Alien Relative*, USCIS, https://www.uscis.gov/i-130 (last visited July 3, 2025). Form I-130 simply requests classification as an immediate relative; it does not itself qualify as an application for a visa or Green Card.[2] 8 U.S.C. § 1154(b); *I-485, Application to Register Permanent Residence or Adjust Status*, USCIS, https://www.uscis.gov/i-485 (last visited July 3, 2025). I-130 petitioners may request that USCIS expedite its review process; USCIS considers such requests on a case-by-case basis. *Expedite Requests*, USCIS, https://www.uscis.gov/forms/filing-guidance/expedite-requests (last visited July 3, 2025). In deciding whether to expedite review of a petition, USCIS considers a number of criteria, including "[e]mergencies or urgent humanitarian situations." *Id.*

If USCIS finds that the noncitizen qualifies as an immediate relative of the petitioner, USCIS then approves the I-130 petition and forwards it to the NVC, an organ of the State Department. 8 U.S.C. § 1154(b); *Immigrant Visa Process, Step 2: Begin National Visa Center Processing*, U.S. DEP'T OF STATE, https://travel.state.gov/content/travel/en/us-visas/immigrate/the-immigrant-visa-process/step-1-submit-a-petition/step-2-begin-nvc-processing.html (last visited July 7, 2025). Upon receipt of the approved I-130 petition, the NVC will create a case file for the noncitizen's immigrant visa application and send the applicant a "Welcome Letter" via email and/or physical mail; this letter provides the applicant with the information necessary to log into an online portal called the Consular Electronic Application Center ("CEAC"). *Immigrant Visa Process, Step 2: Begin National Visa Center Processing*, U.S. DEP'T OF STATE, https://travel.state.gov/content/travel/en/us-visas/immigrate/the-immigrant-visa-process/step-1-submit-a-petition/step-2-begin-nvc-processing.html (last visited July 7,

---

[2] Form I-130 does ask whether the immediate relative of the petitioner "is in the United States and will apply for adjustment of status to that of a lawful permanent resident" at a local USCIS office, or whether the relative "will apply for an immigrant visa abroad" at a U.S. Embassy or Consulate. *Form I-130: Petition for Alien Relative*, USCIS, https://www.uscis.gov/i-130 (last visited Apr. 29, 2025).

2025). The CEAC is the platform that the visa applicant and the supporting petitioner use to complete the application.

After they gain access to the CEAC, the next step is for the applicant and petitioner to pay processing fees. *Immigrant Visa Process, Step 3: Pay Fees*, U.S. DEP'T OF STATE, https://travel.state.gov/content/travel/en/us-visas/immigrate/the-immigrant-visa-process/step-1-submit-a-petition/step-3-pay-fees.html (last visited July 7, 2025). Following payment of the fees, the petitioner must then submit an affidavit of support, by which they accept financial responsibility for the visa applicant, as well as evidence of the petitioner's finances. *Immigrant Visa Process, Step 4: Affidavit of Support*, U.S. DEP'T OF STATE, https://travel.state.gov/content/travel/en/us-visas/immigrate/the-immigrant-visa-process/step-1-submit-a-petition/affidavit-of-support.html (last visited July 7, 2025); *Immigrant Visa Process, Step 5: Financial Documents*, U.S. DEP'T OF STATE, https://travel.state.gov/content/travel/en/us-visas/immigrate/the-immigrant-visa-process/step-5-collect-financial-evidence-and-other-supporting-documents.html (last visited July 7, 2025). Finally, after the petitioner has submitted their affidavit and financial documents, the applicant must submit the online application itself. *Immigrant Visa Process, Step 6: Complete Online Visa Application (DS-260)*, U.S. DEP'T OF STATE https://travel.state.gov/content/travel/en/us-visas/immigrate/the-immigrant-visa-process/step-5-collect-financial-evidence-and-other-supporting-documents/step-6-complete-online-visa-application.html (last visited July 7, 2025). Most immediate-relative visa applicants submit their application using Form DS-260.[3] *Department of State (DS) and Other Non-USCIS Forms*, U.S. DEP'T OF STATE, https://www.uscis.gov/forms/department-of-state-ds-and-other-non-uscis-forms (last visited May 2, 2025).

---

[3] A small number of applicants use an alternate form, DS-230. *Department of State (DS) and Other Non-USCIS Forms*, U.S. DEP'T OF STATE, https://www.uscis.gov/forms/department-of-state-ds-and-other-non-uscis-forms (last visited May 2, 2025).

The INA directs that "[a]ll immigrant visa applications shall be reviewed and adjudicated by a consular officer." 8 U.S.C. § 1202(b); *see also* 22 C.F.R. § 42.81(a) ("When a visa application has been properly completed and executed before a consular officer in accordance with the provisions of the INA and the implementing regulations," the consular officer must issue the visa, refuse the visa, or "discontinue" issuance of the visa [a step taken by the Attorney General pursuant to 8 U.S.C. § 1253(d) for countries that have refused to take back their citizens who have been deported by the United States].) A consular officer may refuse an immigrant visa applicant only after the applicant has submitted a completed Form DS-260. 22 C.F.R. § 42.81. Assuming the application is not refused after the consular officer initially reviews the Form DS-260, any noncitizen "executing an immigrant visa application must be interviewed by a consular officer," who will then determine the applicant's eligibility for a visa based on the applicant's representations, the visa application, and other relevant documentation. 22 C.F.R. § 42.62(b)(1). But the NVC will not begin the process of scheduling an interview appointment at the appropriate embassy or consulate until it has determined that the noncitizen's visa application is otherwise "documentarily complete," meaning that the applicant has submitted all the required documents and paid the necessary fees. *See Immigrant Visa Process, Step 9: Upload and Submit Scanned Documents*, U.S. DEP'T OF STATE, https://travel.state.gov/content/travel/en/us-visas/immigrate/the-immigrant-visa-process/step-8-scan-collected-documents/step-9-upload-and-submit-scanned-documents.html (last visited July 3, 2025); *see also* 22 C.F.R. §§ 42.65, 42.67(a)(1).

Visa interviews are not performed immediately. The wait time for such interviews at a particular embassy or consulate is influenced by a number of factors, including the volume of applications pending at that consular location, the staffing levels at the consular location, and the time spent "vetting" each applicant. *IV Scheduling Status Tool*, U.S. DEP'T OF STATE, https://travel.state.gov/content/travel/en/us-visas/visa-information-resources/iv-wait-times.html last visited July 3, 2025). The NVC schedules interview appointments in the order that pending

6

applications become documentarily complete. *Id.* An applicant may request expedited review, but expedited review of a visa application is available only in cases involving a "life or death medical emergency." *Id.* Such requests must be accompanied by a letter or statement from a physician or medical facility attesting to and explaining the emergency. *Id.* Upon receiving a request for expedition, the NVC will contact the appropriate U.S. embassy or consulate and communicate the request; consular offices consider these requests on a case-by-case basis. *Id.*

## II. Bangert's Allegations and Animaw's Visa Application

Bangert's complaint itself contains almost no description of the facts underlying this case; instead, Bangert attaches to his complaint copies of several emails he has written to officials at the State Department, USCIS, and the offices of United States Senator Tammy Duckworth in an effort to speed up the approval of Animaw's visa. (*See* Compl. [7] at 6-28.) In describing Bangert's allegations, the court may consider such documents attached to the complaint. *Amin Ijbara Equity Corp. v. Vill. of Oak Lawn*, 860 F.3d 489, 493 n.2 (7th Cir. 2017). The court will also consider facts described in Bangert's response briefing on the pending motion, to the extent that those assertions add detail to Bangert's complaint, rather than contradict or fundamentally alter the narrative. *See Smith v. Dart*, 803 F.3d 304, 311 (7th Cir. 2015) ("facts alleged by a plaintiff in a brief in opposition to a motion to dismiss may be considered when evaluating the sufficiency of a complaint so long as they are consistent" with the complaint's allegations) (citation omitted).

Dylan Bangert is a U.S. citizen residing in Machesney Park, Illinois. (Compl. at 5, 10.) Bangert's wife, Afomiya Animaw, is an Ethiopian citizen residing in that country. (Pl. Resp. [24] at 2.) Animaw is a member of an ethnic group called the Amhara, one of the three largest ethnic groups in Ethiopia, along with the Oromo and Tigre. (Compl. at 10; *see also Archive: Background Note: Ethiopia, Oct. 2008*, U.S. DEP'T OF STATE, https://2001-2009.state.gov/r/pa/ei/bgn/2859.htm (last visited June 30, 2025).) It is not clear from Bangert's pleadings how he and Animaw met, or when and where they married, but according to Bangert, the couple have never lived together. (Compl. at 10.) It is also unclear from the pleadings exactly where Animaw lives within Ethiopia.

7

It appears that in March 2022, Animaw was living in Addis Ababa, the capital of the nation, but a May 2024 email sent by Bangert to the NVC and attached to his complaint suggests that at that time, Animaw was living outside the capital city, somewhere in the surrounding Oromia region. (*Compare* Pl. Resp. at 2 *with* Compl. at 10.)

Bangert alleges that the Amhara people, particularly those living in the Oromia region, are being subjected to ethnic cleansing and genocide at the hands of Oromo militants acting at the direction of the Ethiopian government. (Compl. at 10.) Bangert further alleges, based on a 2022 press release by the United Nations, that Amhara women in Ethiopia more broadly are being targeted for abduction and sex trafficking as they flee ongoing armed conflict. (*Id.*); *see also Ethiopia: Critical Moment to Strengthen Fight Against Trafficking in the Tigray, Afar, and Amhara*, UNITED NATIONS OFF. OF THE HIGH COMM'R OF HUM. RIGHTS (Oct. 3, 2022), https://www.ohchr.org/en/press-releases/2022/10/ethiopia-critical-moment-strengthen-fight-against-trafficking-tigray-afar. Finally, Bangert alleges that "due to communication blackouts instilled by the [Ethiopian] government," he often goes "days or weeks with no contact whatsoever" with his wife. (Compl. at 10.)

Bangert's allegations are largely consistent with the State Department's assessment of the conditions on the ground in Ethiopia. As of July 2023, the State Department has advised that while the "security situation in Addis Ababa is stable," Americans should not travel to most of the rest of Ethiopia and that "[s]pecific areas" within the Oromia region should be avoided "due to sporadic violent conflict, civil unrest, and ethnically motivated violence." *See Ethiopia Travel Advisory*, U.S. DEP'T OF STATE (July 31, 2023), https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/ethiopia-travel-advisory.html. The State Department warns of the same conditions, coupled with the risk of kidnapping, in other areas of Ethiopia, as well, including the border regions with neighboring Somalia, Sudan, and South Sudan, and warns of "communications disruptions" across Ethiopia as a whole. *Id.*

Bangert filed a I-130 petition to have his wife, Animaw, classified as an "immediate relative" by USCIS on March 11, 2022. (Pl. Resp. at 2.) That petition was approved by USCIS on December 24, 2022. (*Id.*) Apparently, however, USCIS did not forward the petition to the NVC at that time. According to Bangert, the notice he received advising him of the approval—which is not attached to the complaint—stated:

> The above petition has been approved. However, you did not indicate on the petition whether the beneficiary intends to apply for an immigrant visa abroad at a U.S. Embassy or a U.S. Consulate or will apply for adjustment of status in the United States. Therefore, USCIS has retained the petition.

(*Id.*) Adjustment of status is the process by which a noncitizen already present in the United States may apply for a Green Card without having to return to their home country. *Adjustment of Status*, USCIS, https://www.uscis.gov/green-card/green-card-processes-and-procedures/adjustment-of-status (last visited July 7, 2025). It is unclear whether Bangert denies having failed to fill out some part of the petition, but he asserts it should have been obvious that Animaw intended to apply for the visa at a consulate abroad, rather than apply from within the United States, because he listed her address in Addis Ababa on the I-130 petition. (*Id.*) Bangert further asserts that the approval notice advised that "[i]f the beneficiary decides to apply for an immigrant visa outside the United States based on this petition, you should file Form I-824, Application for Action on an Approved Application or Petition, to request that we send the petition to the U.S. Department of State National Visa Center (NVC)." (*Id.*)*; see also I-824, Application for Action on an Approved Application or Petition*, USCIS, https://www.uscis.gov/i-824 (last visited July 3, 2025).

Bangert filed a copy of Form I-824 with USCIS on January 30, 2023. (Pl. Resp. at 2; Compl. at 17.) When there had been no further communication from USCIS by May 26, 2023, Bangert on that date requested expedited review of his Form I-824 submission by USCIS, and on May 30, 2023, received a response from USCIS confirming that it would accommodate this

9

request. (*See* Compl. at 17.) Bangert alleges that USCIS approved his request to expedite his petition based on "acknowledged humanitarian necessity." (Pl. Resp. at 3.)

How Animaw's visa application progressed from this point is unclear. Bangert appears to allege that on August 23, 2023, he contacted the NVC to request that Animaw's application process be expedited[4], only to receive a reply from the NVC on September 6, 2023 stating that it had yet to receive the approved Form I-130 petition from USCIS. (Compl. at 8.) Recall that, according to the regulatory process described above, the NVC will only create a case file and make the CEAC portal available for an applicant after the NVC receives an approved Form I-130 petition for that applicant from USCIS.

On May 14, 2024, Bangert emailed the NVC again; by this point, it appears that Animaw's application had been assigned a case number by the NVC, presumably, NVC had received the approved Form I-130 petition from USCIS by then, though it is not clear on what date. (*Id.* at 13.) Bangert's May 14 email to the NVC is difficult to interpret, but in it, Bangert appears to assert (1) that the NVC is a rogue entity with no authority to involve itself in Animaw's immigration case (or, indeed, any immigration case); and (2) that Animaw should have received her visa on the same day that USCIS agreed to expedite its review of Bangert's I-824 form. (*See id.* at 14.)

Bangert initiated this lawsuit on June 28, 2024. (*See* Compl. at 1.) His complaint does not state whether or when Animaw submitted the required visa application forms or fees to the NVC, or even whether Animaw had completed her application prior to Bangert's filing suit demanding that the NVC schedule her interview.

Defendants' motion to dismiss the complaint is supported by the declaration of Rebecca Austin, Assistant Director of the NVC, who states that Animaw's visa application did not become documentarily complete—meaning Animaw had not submitted all of the forms associated with the

---

[4] Bangert's pleadings do not make clear whether he described Animaw's situation as a medical emergency, or whether he submitted any supporting documentation from a physician or medical facility.

application—until March 1, 2024, and that as of December 5, 2024, there were 3,568 individuals in the immediate-relative category ahead of Animaw in the queue for an interview at the Embassy in Addis Ababa. (Austin Decl. [17-1] ¶¶ 6, 7.) Defendants argue that the court may take notice of these details because Austin's declaration "fills in details of documents" that Bangert "references in the complaint." (Mem. at 4 n.3 (quoting *Sabo v. Mayorkas*, No. 23 C 2189, 2024 WL 2863373, at *2 n.3 (N.D. Ill. June 5, 2024)))

The court is free to take notice of facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," as well as "matters of public record," in ruling on a motion to dismiss, *Fosnight v. Jones*, 41 F.4th 916, 922 (7th Cir. 2022), but declines to take notice of the facts set forth in Austin's declaration. Defendants here are not asking the court to take notice of State Department documents whose authenticity cannot be questioned; instead, Austin's declaration simply represents what her testimony would be at a hearing or on summary judgment. The situation here differs from *Sabo,* where the court took notice of two documents the government had issued to the plaintiff: (1) a decision from USCIS denying the plaintiff's I-751 petition to remove conditions placed on her status as a permanent resident, and (2) a copy of a notice to appear in a removal proceeding. (No. 23 C 2189, Dkt. Nos. 14-1, 14-2.) More importantly, in *Sabo*, this court cited the documents in its opinion only to illustrate facts that the plaintiff had already *conceded* in her response to the defendants' motion to dismiss. 2024 WL 2863373, at *2 n.3, 4. Bangert's response in this case does not acknowledge Austin's declaration, or even the existence of the NVC application process.

## **LEGAL STANDARDS**

Defendants have moved to dismiss all of Bangert's claims, either for lack of subject matter jurisdiction under Rule 12(b)(1) or for failure to state a claim under Rule 12(b)(6).

When considering a motion to dismiss under Rule 12(b)(6), courts must accept the "well-pleaded facts in the complaint as true and draw reasonable inferences in the plaintiff's favor." *Esco v. City of Chicago*, 107 F.4th 673, 678 (7th Cir. 2024) (citation omitted). Further, pro se

11

filings like Bangert's must be construed liberally. *Johnson v. Prentice*, 29 F.4th 895, 903 (7th Cir. 2022). Nevertheless, even pro se pleadings "must go beyond mere labels and conclusions" and "raise a right to relief above the speculative level" to survive a motion to dismiss. *Brockett v. Effingham Cnty., Ill.*, 116 F.4th 680, 685 (7th Cir. 2024) (citation omitted).

Defendants may challenge subject matter jurisdiction under Rule 12(b)(1) in two ways. A "factual challenge" contends that "there is *in fact* no subject matter jurisdiction," even if the pleadings are formally sufficient, while a "facial challenge" argues the plaintiff has not sufficiently "*alleged* a basis of subject matter jurisdiction." *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015) (citations omitted). "In reviewing a factual challenge, the court may look beyond the pleadings and view any evidence submitted to determine if subject matter jurisdiction exists."[5] *Id.* "In reviewing a facial challenge, the court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiff," as with a motion to dismiss for failure to state a claim. *Id.* Defendants appear to invoke both kinds of subject matter jurisdiction challenges here. (*See* Mem. [17] at 5.)

## DISCUSSION

Bangert seeks a writ of mandamus, or an order requiring Defendants to grant Animaw's request for a visa. Bangert claims he is entitled to relief under three theories: (1) pursuant to 42 U.S.C. §§ 1983, 1985, or 1986 (Compl. at 1–2; Pl. Resp. at 2–3); (2) under the common law of negligence (Compl. at 2 (alleging "gross negligence" by the Defendants)); or (3) otherwise under the APA. Pl. Resp. at 6.

### I. Subject Matter Jurisdiction and Standing

The court turns, first, to the question of its subject-matter jurisdiction. On this score, Bangert's argument that he or his wife are entitled to an injunction against the NVC and Embassy

---

[5] As explained below, the assertions in Rebecca Austin's declaration do not bear on subject matter jurisdiction but rather go to the potential merits of an unreasonable delay claim under the APA.

12

under the common law of negligence requires only brief discussion: Defendants here are all part of the federal government, and "[t]he United States has waived its sovereign immunity to tort liability only under the Federal Tort Claims Act, which vests exclusive jurisdiction over such claims in federal court." *Rodas v. Seidlin*, 656 F.3d 610, 616 (7th Cir. 2011) (citing 28 U.S.C. § 1346(b)(1)). And the Federal Tort Claims Act vests federal district courts with jurisdiction only over tort claims against the federal government "for money damages." 28 U.S.C. § 1346(b)(1); *Brownback v. King*, 592 U.S. 209, 212 (2021). Because Bangert only seeks a writ of mandamus or injunctive relief in this action, the court will not entertain his negligence claims.[6]

All of Bangert's claims against Defendant USCIS must be dismissed as well. As USCIS points out, it has "*already done its part*" in Animaw's visa application process "by adjudicating the plaintiff's I-130 petition on an expedited basis." (Mem. at 7.) Under the statutory and regulatory framework that controls this case, USCIS has no authority to take either of the further steps Bangert urges: scheduling Animaw's visa interview or approving her visa application. Those functions are completed by the State Department, via the NVC and the relevant embassy or consulate. *See supra* at p. 4. Bangert's claims against USCIS are dismissed as moot. *See Evers v. Astrue*, 536 F.3d 651, 662 (7th Cir. 2008) ("Mootness is a threshold jurisdictional question that insures that the court is faithful to the case or controversy limitation in Article III of the Constitution") (citation omitted).

Bangert's remaining claims face a different jurisdictional hurdle: standing. *See Moore v. Wells Fargo Bank, N.A.*, 908 F.3d 1050, 1057 (7th Cir. 2018) ("Standing is an element of subject-matter jurisdiction in a federal civil action") (citation omitted). To have standing, a plaintiff must have (1) suffered a concrete, particularized, and actual or imminent injury (an "injury-in-fact"), that

---

[6] The court also notes that any claim by Bangert for money damages under the Federal Tort Claims Act would be barred unless he first presented an administrative claim directly to the agencies at issue here within two years of the claim accruing. *See* 28 U.S.C. § 2401(b); *Buechel v. U.S.*, 746 F.3d 753, 758 (7th Cir. 2014). It is not clear whether Bangert did so here.

(2) is fairly traceable to the challenged conduct of the defendant, and (3) is likely to be redressed by a favorable judicial decision. *Morgan v. Fed. Bureau of Prisons*, 129 F.4th 1043, 1048 (7th Cir. 2025) (citations omitted). Bangert, the only plaintiff in this matter, is not the person applying for a visa—Animaw is. *See Marin-Garcia v. Holder*, 647 F.3d 666, 670 (7th Cir. 2011) (generally, "Person A is not entitled to advance the legal interests of Person B in federal court") (citations omitted).

Still, Bangert himself—as Animaw's spouse and the petitioner supporting her immediate-family visa application—may have an independent right to sue the NVC and the Embassy under the Administrative Procedure Act ("APA") for unreasonably delaying Animaw's application for the immediate-relative visa created by the INA. *See Cook Cnty., Illinois v. Wolf*, 962 F.3d 208, 219 (7th Cir. 2020) (where plaintiffs allege agencies have run afoul of the INA, plaintiffs may sue those agencies under the APA so long as plaintiffs' interests are not "so marginally related to or inconsistent with" the purposes implicit in the INA that it "cannot reasonably be assumed that Congress intended to permit the suit"); *Ebrahimi v. Blinken*, 732 F. Supp. 3d 894, 904–05 (N.D. Ill. 2024) (both immediate-relative visa applicant and his U.S. citizen daughter who filed a Form I-130 petition on his behalf had standing to bring an unreasonable delay claim against State Department officials under the APA).

That said, as Defendants correctly note, Bangert has no constitutionally protected interest in Animaw's visa application.[7] (*See* Mem. at 10–12.) Bangert argues that Animaw's visa application implicates his "right to due process, life, liberty, the pursuit of happiness," and his "[un]enumerated rights of the 9th [A]mendment." (Pl. Resp. at 2.) But the Supreme Court recently confirmed in *Dep't of State v. Muñoz* that an American citizen "does not have a fundamental liberty

---

[7] To the extent Bangert seeks to vindicate Animaw's constitutional rights, those claims too must fail because Animaw—a noncitizen who is not in U.S. territory—has no constitutional rights of her own. *See Agency for Int'l Develop. v. All. for Open Soc'y Int'l, Inc.*, 591 U.S. 430, 433 (2020).

interest in [their] noncitizen spouse being admitted to the country" under the Fifth Amendment. 602 U.S. 899, 909 (2024). And it is well-established that the Ninth Amendment does not give individuals a right to sue in court. *Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1075 (7th Cir. 2013) (citation omitted).

## II. Bangert's APA Claim

What is left for the court's consideration is Bangert's potential APA claim. Bangert has a stronger claim for standing under the APA, but this does not mean he is entitled to relief under that statute. First, to the extent Bangert seeks an order directing the remaining Defendants to approve Animaw's visa application, his APA claim is barred by the doctrine of consular nonreviewability.[8] This doctrine holds that the judiciary has no role to play in the federal government's admission and exclusion of foreign nationals, except where (a) judicial review is expressly authorized by law or (b) the denial of a visa burdens the constitutional rights of a U.S. citizen. *Muñoz*, 602 U.S. at 907–908. The INA "does not authorize judicial review of a consular officer's denial of a visa," *id.* at 908, and as explained above, Bangert does not have a constitutionally protected interest in his noncitizen spouse's admission into the United States. This court thus has no authority to order the NVC or the Embassy to approve Animaw's application.

The doctrine of consular nonreviewability does not, however, bar Bangert from seeking an order under the APA directing those Defendants to move Animaw's visa case along by scheduling her interview. As explained below, the INA, in concert with the APA, makes delays in adjudicating visa applications reviewable by the courts.[9]

---

[8] The Seventh Circuit treats the doctrine of consular nonreviewability "as a matter of a case's merits rather than the federal courts' subject matter jurisdiction." *Matushkina v. Nielsen*, 877 F.3d 289, 294 n.2 (7th Cir. 2017) (citations omitted).

[9] Notably, the availability of a remedy under the APA would spell the end of Bangert's mandamus claims. "Mandamus relief will be granted if the plaintiff can demonstrate that the three enumerated conditions are present: (1) a clear right to the relief sought; (2) that the defendant has a duty to do the act in question; and (3) no other adequate remedy is available."

A.   **State Department's Duty to Adjudicate Visa Applications**

The APA grants federal courts the power to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Claims under this provision of the APA "can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). Thus, in order for Bangert's APA claim to prevail, the NVC and Embassy must have a duty to adjudicate Animaw's visa application.

As noted earlier, the INA states that "[a]ll immigrant visa applications *shall* be reviewed and adjudicated by a consular officer." 8 U.S.C. § 1202(b) (emphasis added). To the court's knowledge, neither the Seventh Circuit nor any other Court of Appeals has ruled on the question of whether this statutory provision creates a mandatory duty on the part of the government to review and adjudicate *all* visa applications. *But see Patel v. Reno*, 134 F.3d 929, 932–33 (9th Cir. 1997) (concluding that a State Department regulation, 22 C.F.R. § 42.81, required a consular office to act on visa applications, either by approving or refusing them). The court notes, however, that in *Iddir v. I.N.S.*, the Seventh Circuit considered whether the INA created the right to timely adjudication for applicants to the diversity visa program.[10] 301 F.3d 492, 499 (7th Cir. 2002). At the time of that decision, 8 U.S.C. § 1202(b) did not contain the language "[a]ll immigrant visa applications shall be reviewed and adjudicated by a consular officer"—that text was added to the statute by amendment in 2004. *See* Pub. L. 108–458, 118 Stat. 3814 (2004). Even so, the *Iddir* court held that other, less explicit language present in the INA at the time created a duty on the

---

*Iddir v. I.N.S.*, 301 F.3d 492, 499 (7th Cir. 2002) (citation omitted). Where, as here, a mandamus claim seeks an order compelling agency action but there is an avenue for relief under the APA, the mandamus claim fails. *See Lubega v. Mayorkas*, No. 23 C 17177, 2024 WL 4206425, at *1 (N.D. Ill. Sept. 11, 2024) (collecting cases).

[10]   The diversity visa program distributes visas "to persons from countries that historically have low rates of immigration to the United States." *Iddir*, 301 F.3d at 494 (citing 8 U.S.C. § 1153(c)(1)).

part of the now-defunct Immigration and Naturalization Service to adjudicate diversity visa applications as a general matter, though the court could not grant relief to those appellants in particular.[11] 301 F.3d at 500–01. As the court explained, Congress had "selected the term 'shall' to describe the Attorney General's various duties in administering" the diversity visa program. *Id.* at 499. The court specifically highlighted 8 U.S.C. § 1153(e)(2), which states that "[i]mmigrant visa numbers made available under [the sections of the INA relating to diversity visas] shall be issued to eligible qualified immigrants strictly in a random order established by the Secretary of State for the fiscal year involved." *Id.* In the *Iddir* court's estimation, "[t]he term 'shall' denotes a clear directive, a command, as opposed to the terms 'may' or 'in his discretion.'" *Id.* (citations omitted). Despite the fact that there was no text in the INA at the time specifically stating that the government "shall" adjudicate the applications of any particular visa applicants, the court read that duty into the statute with respect to diversity visa applications.

The current statutory language is more explicit: Section 1202(b) specifically states that visa applications "shall" be reviewed and adjudicated, without limitation to any particular kind of visa. And the Seventh Circuit has been clear about the meaning of the word "shall" in statutory text. *See Taylor v. McCament*, 875 F.3d 849, 853 (7th Cir. 2017) (citing *Patel v. Rodriguez,* No. 15 C 486, 2015 WL 6083199, at *5 (N.D. Ill. Oct. 13, 2015)) (approving of a court interpreting the term "shall" in the manner prescribed by *Iddir*). This court thus concludes, similar to a number of its colleagues, that § 1202(b) creates a duty on the part of the State Department to adjudicate visa applications in a reasonable period of time. *See, e.g., Patel v. Sanders*, No. 24 C 8386, 2025 WL 1039505, at *6 (N.D. Ill. Apr. 7, 2025); *Zadeh v. Blinken*, No. 23 C 3721, 2024 WL 2708324,

---

[11] As the *Iddir* court explained, "the INS did have the duty to adjudicate the appellants' applications in a reasonable period of time." 301 F.3d at 500. But because the INA states that diversity visa applicants are eligible for the visa only "through the end of the specific fiscal year for which they were selected," and the fiscal year that the appellants had been selected in had long passed, "even if the INS adjudicated the applications today, visas could not be issued." *Id.* at 500–01.

at *12 (N.D. Ill. May 20, 2024); *Ebrahimi*, 732 F. Supp. 3d at 909.[12]  *See also Calderon-Ramirez v. McCament*, 877 F.3d 272, 275 (7th Cir. 2017) (extrapolating from *Iddir* to find that applicants for the U-visa, a visa authorized by the Victims of Trafficking and Violence Protection Act of 2000, rather than the INA, had a right to adjudication of their applications in a reasonable period of time).

Some courts have reasoned that, even if the INA creates the duty to adjudicate visa applications as a general matter, it does not follow that the statutory and regulatory scheme creates a specific duty for the State Department to schedule interviews.  The argument is that, because 22 C.F.R. § 42.81(a) only considers an applicant to have actually "made" or "filed" their visa application *after* they have appeared for an interview, the duty to adjudicate can only be triggered after the interview has taken place.  *See Khan v. Bitter*, No. 22 C 6617, 2023 WL 6311561, at *3 (N.D. Ill. Sept. 28, 2023) (citing *Taj v. U.S. Dep't of State*, No. 22 C 1087, 2022 WL 17250302, at *5 (D.D.C. Nov. 28, 2022)).

To be clear, the INA itself does not require the State Department to conduct interviews for every visa applicant, and under 22 C.F.R. § 42.81(b), the State Department may deny a visa application without ever interviewing the applicant, so long as the applicant has submitted form DS-260.  On the other hand, reading the statutory and regulatory scheme such that the duty to adjudicate applications attaches only after an interview has been completed "would neuter any mandatory effect that these laws have in the first place," because "an agency could avoid its duty to adjudicate applications by simply not scheduling any interviews," leaving visa applicants in a "catch-22."  *Russell v. Blinken*, No. 23 C 520-JDP, 2024 WL 1908814, at *3 (W.D. Wis. May 1, 2024) (citations omitted).

---

[12]  The court recognizes that some district courts around the country fall on the other side of this issue.  *See, e.g., Prince v. Blinken*, No. 2:23 C 100-PPS/APR, 2023 WL 5670158, at *3 (N.D. Ind. Aug. 31, 2023); *Babamuradova v. Blinken*, 633 F.Supp.3d 1, 14 (D.D.C. 2022).

18

Because the State Department has a duty to adjudicate Animaw's visa application, Bangert could possibly state a claim against the State Department under the APA for unreasonably delaying that adjudication. But he has not (yet) done so.

### B. Unreasonable Delay

Recall that Bangert's pleadings provide no information at all about Animaw's application with the NVC. Indeed, Bangert's position seems to be that Animaw's visa should have been granted as soon as USCIS approved his I-130 petition, and that the NVC's application process is illegitimate in and of itself—a position with no basis in law.

Under State Department policy, Animaw was not eligible to be scheduled for an interview until her visa application became "documentarily complete," meaning that she submitted all the necessary forms and fees associated with the application. On these facts, the court believes the correct starting point for measuring the relevant delay is the date on which Animaw's application with the NVC became documentarily complete. Defendants, citing a declaration by Rebecca Austin, Assistant Director of the NVC, suggest this date was March 1, 2024. The court has declined to take judicial notice of this date based only on Austin's declaration, but if her assertion is accurate, Bangert will face an uphill battle to prevail on a claim of unreasonable delay. *See Ebrahimi*, 732 F. Supp. 3d at 911 (canvassing cases and failing to unearth "any decision by any court" concluding that a visa adjudication taking fewer than two years amounts to an unreasonable delay.)

## **CONCLUSION**

For the reasons described above, Defendants' motion to dismiss is granted. Ordinarily, a plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend their complaint before the entire action is dismissed. *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*, 786 F.3d 510, 519 (7th Cir. 2015) (citation omitted). A court may decline to grant leave to amend claims dismissed in the first complaint only where it "is *certain* from the face of the complaint that any amendment would be

futile or otherwise unwarranted." *Id.* at 519–20 (citation omitted).

So long as the doctrine of consular nonreviewability is the law of the land, there is no set of facts Bangert could allege that would allow this court to order any Defendant to approve Animaw's visa application. Similarly, there is no set of facts Bangert could allege that would give him standing to sue USCIS for an order scheduling Animaw's visa interview, because that agency does not have the authority to schedule the interview. No matter what facts he alleges, binding precedent prevents this court from accepting Bangert's claim that he has a constitutional right to have Animaw join him in America under either the Fifth or Ninth Amendments, or that Animaw has any constitutional rights at all so long as she remains a noncitizen residing in Ethiopia. Finally, under 28 U.S.C. § 1346(b)(1), there are no additional facts that would create jurisdiction for this court to grant the injunctive relief Bangert seeks against the United States based on a theory of negligence. These claims are all dismissed with prejudice.

Bangert may have a claim under the APA for unreasonable delay in adjudicating Animaw's visa application. For now, that claim as against the NVC and the Embassy is dismissed without prejudice. Bangert has leave to file an amended complaint that comports with the direction set forth above, and should do so no later than August 8, 2025.

ENTER:

Dated: July 8, 2025

_____
REBECCA R. PALLMEYER
United States District Judge